NO. 4-07-0704          Filed 5/7/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ex rel. TAMMI SUSSEN, Petitioner-Appellee, v. THOMAS G. KELLER, Respondent-Appellant. | ) ) ) ) ) ) ) ) ) ) ) | Appeal from Circuit Court of Champaign County No. 90L37 Honorable Brian L. McPheters, Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

Petitioner, Tammi Sussen, and respondent, Thomas G. Keller, are the parents of David, born December 17, 1987. In July 2007, the trial court entered an order directing Keller to pay one-third of the cost of tuition, books, registration, rent, and food for David to attend Lincoln College of Technology (Lincoln College) in Indianapolis, Indiana. Keller appeals. Because the court abused its discretion by finding the cost to attend Lincoln College was reasonable, we reverse and remand with directions.

I. BACKGROUND

In January 1990, the Illinois Department of Public Aid filed a paternity complaint against Keller on Sussen's behalf. In December 1990, the trial court entered a judgment of parentage and order for support. Keller was in arrears on his child-support obligation several times over the years and support was abated once due to Keller's unemployment.

In August 2004, after Keller inherited $50,000, Keller consented to $25,000 of the funds being deposited in a bank account until further hearing could be held on Sussen's motion to establish a trust for support and educational expenses. In October 2004, the trial court ordered that the $25,000 in the bank account was to be used to support David and provide for educational expenses should David decide to attend postsecondary education and should the court order payment of such expenses. Any funds remaining after such time would be returned to Keller. The court also directed that $300 a month be distributed from the bank account to Sussen as continuing child support for David. In January 2005, the court ordered $5,000 be distributed from the account to Sussen as child support from the inheritance (20% of $25,000) and $418 be distributed from the account to Sussen for payment of a certain amount of David's orthodontic expenses.

In June 2007, Sussen filed a petition for support for educational expenses. The petition alleged that David had been accepted into a 15-month program at Lincoln College. The petition sought contribution from Keller for the expenses of attending Lincoln College, including tuition, books, and fees ($26,753), rent ($4,125), living expenses, health and medical insurance, and dental expenses. According to the petition, David obtained grants totaling $8,100, David and Sussen had applied for loans, and David intended to work part-time.

On June 28, 2007, the trial court held a hearing on the petition.

- 2 -

A. Testimony Pertaining to Lincoln College, Shawnee
Community College, and Living Expenses

The testimony established that David had graduated high school where he had earned As and Bs. David had focused on automotive classes in high school and wanted to continue his studies in that area. David wanted to attend Lincoln College, which offered a 15-month automotive-technology program that would teach David how to service and repair motor vehicles. When asked why he was interested in Lincoln College, David stated, "It's away from home. I have heard really good stories about them." David further explained that at Lincoln College, he did not have to take any general-education classes, which explained why the program took only 15 months--consisting of two terms or sequences--to complete. David met with a recruiter, who explained that NASCAR and Mercedes-Benz hired graduates from Lincoln College. David did not know if he wanted to work for either of those two companies. David testified that when he graduated, he would be "ASC" certified (the record does not indicate what "ASC" certified means) and be fully trained in high-performance automotive technology. David did not know if graduates from Shawnee were ASC certified. The Lincoln College materials admitted into evidence demonstrate that upon completion of the program, students are awarded an associate-of-applied-science degree.

David intended to rent an apartment with two other students. The total rent per month was $799, of which David

would pay one-third.  The rent did not include gas and electric costs.  Sussen estimated gas and electric costs would total approximately $180 per month, of which David would pay one-third. Sussen estimated David's food costs would total approximately $200 per month.

Keller provided information about Shawnee Community College (Shawnee), which also offered an automotive-technology program.  The Shawnee campus was located approximately 20 to 25 miles south of where Sussen and David lived.  Excerpts from the Shawnee course catalog, admitted into evidence, demonstrated the Shawnee program was a 67-hour program--approximately 21 months of schooling--at a cost of $65 per credit hour, which totaled $4,355.  Service fees totaled $402.

According to the Shawnee materials, students in the program receive an associate-of-applied-science degree upon completion.  The Shawnee program is ASE certified ("ASE" apparently stands for "automotive service excellence"), and Shawnee is accredited by the North Central Association Commission on Accreditation and School Improvement.  The Lincoln College materials provide no information about accreditation.

Sussen testified she did not look into the Shawnee program "too much" because it did not offer what Lincoln College offered and was a different program.  Sussen claimed the automotive-technology course at Shawnee was not the same course as offered by Lincoln College.  Sussen explained that Shawnee "probably" offered a two- to four-year program while Lincoln

College offered a 15-month, high-performance maintenance program, which is what David wanted. The Lincoln College materials indicate the program has a "[six]-[c]ourse [h]igh[-p]erformance add-on program," but the record otherwise contains no information about "high-performance maintenance."

David testified Shawnee Community College did not seem as good to him as Lincoln College. David thought Lincoln College was a "better fit" for him. Sussen testified it would save money and time if David attended Lincoln College because he would become gainfully employed once he finished the program.

Keller's objections to David attending Lincoln College included the cost, the lack of accreditation, and the distance from home. Keller assumed David would live with Sussen if he attended Shawnee.

B. Testimony Regarding the Parents' Financial Circumstances

Sussen testified that at the time of the hearing, she earned $500 per week and expected to earn that sum through the summer. By late fall, Sussen would earn approximately $400 a week. Sussen testified she earned $14,000 to $18,000 in 2006. Sussen's financial affidavit, contained in the record, indicated Sussen had income of approximately $2,300 per month (excluding the $300 a month in child support she had been receiving from Keller) and received an additional $720 from "boarders." Sussen has a 12-year-old daughter for whom she received no child support. Sussen's stated expenses totaled approximately $2,501.38, and she had no assets.

According to Keller's testimony and financial affidavit, Keller lived with his girlfriend, Laura Bower, in a house Bower owned. Keller paid Bower $360 a month toward her house payment. Keller was currently unemployed and on temporary medical light duty following a "knee scope" to remove two-thirds of the meniscus. He last worked in May or June 2007 for Dash Management, a maintenance-management company. Keller testified his previous job had "a lot of knee work, working on fryers and grills and crawling around on my knees and climbing ladders." He did not expect to be able to return to that type of work but was currently looking for employment. He planned on building a deck for a former employer to make money. Keller had also applied for unemployment and expected to receive $300 per week.

Keller testified he earned $29,000 in 2006 and $22,000 in 2005. Keller testified he averaged earnings of $22,000 a year the past five or six years. He confirmed that for 2005 and 2006, child support was taken directly from the bank account established for David.

Keller's monthly expenses totaled approximately $1,900 (including car payments for his and Bower's vehicles). His assets included a 2001 Dodge Dakota (for which he was still making payments) and a 1969 Harley Davidson motorcycle worth $10,000.

Keller testified he used the portion of the inheritance not deposited in the bank account for David ($25,000) to pay bills and living expenses and make repairs on the house. Keller

also purchased a truck (which he no longer owned), shop equipment, a car-hauling trailer, and a hot tub. Keller gave $8,000 to $10,000 of the inheritance to his girlfriend for money he owed to her.

Bowman testified she had lived with respondent for four years. They shared living expenses. She used the money he gave her from the inheritance to pay bills because Keller had been "off work" for six months and had gotten behind on his bills and living expenses. Bower testified that because Keller was currently unemployed, he was not paying one-half of the living expenses.

### C. Testimony Regarding Funds Taken From Account

Keller testified that the State of Illinois took $4,098.51 from the bank account established for David to pay a child-support arrearage for Betty Stockwill. (In a document contained in the record, Keller asserted he had consented to adopt Betty years earlier.) Keller testified he did not have the funds to pay the arrearage and did not think he had any means of stopping the State from taking the funds from the bank account. Keller testified that when he spent the money from the inheritance, he was not aware of the obligation owed to Stockwill. When the court held the hearing on the petition for educational expenses, the bank account contained approximately $5,000.

### D. Trial Court's Ruling

At the conclusion of the hearing, the trial court found

- 7 -

that whether Lincoln College was an accredited school did not matter much given that David's goal was to be an automotive mechanic and not to seek further education. After examining all the relevant factors, the court stated it "boils down to the *** parties' abilities to pay for a very expensive school." The court characterized Lincoln College as a "proprietary school," a for-profit business that provides training. The court noted it did not have information about any other proprietary school that would cost substantially less than Lincoln College. The court concluded Lincoln College was an appropriate school for David's interests and aptitude.

The trial court then examined the parties' ability to pay. The court noted the bank account established for David would have had an additional $4,000 available for David's education had the State not taken the arrearage for Betty. The court also noted Keller had a motorcycle valued at $10,000. The court recognized that respondent was currently unemployed but noted Keller admitted he was employable. The court did not determine the amount Keller could expect to earn in 2007, except to state that it was not appropriate to find that Keller would continue to earn $22,000 a year when in 2006 he earned $29,000. The court ordered respondent to pay one-third of the cost of attending Lincoln College, including living expenses.

In July 2007, the trial court entered a written order. The court calculated the total cost to attend Lincoln College, including tuition, books, registration, rent, and food, was

$35,273.  The court ordered Keller to pay one-third ($11,757.67) at a rate of $6,000 within 21 days and the remainder ($5,757.67) 30 days prior to the start of the second term at Lincoln College. The court directed that the balance of the bank account (approximately $5,000) be transferred to Sussen.

This appeal followed.

## II. ANALYSIS

Keller appeals the trial court's order, arguing that the cost to attend Lincoln College was not reasonable and Keller did not have the means to pay those costs.

### A. Standard of Review

The parties assert appellate courts are split regarding the appropriate standard of review.  We agree that the appropriate standard of review is unclear.  This court has routinely reviewed a trial court's decision to award educational expenses for an abuse of discretion.  See In re Marriage of Spear, 244 Ill. App. 3d 626, 629, 613 N.E.2d 358, 360 (1993) (Fourth District reviewing for an abuse of discretion); In re Marriage of Alltop, 203 Ill. App. 3d 606, 618, 561 N.E.2d 394, 402 (1990) (Fourth District reviewing for an abuse of discretion).  However, in In re Support of Pearson, 111 Ill. 2d 545, 547, 490 N.E.2d 1274, 1275 (1986), the Illinois Supreme Court reviewed an order for educational expenses under the manifest-weight-of-the-evidence standard.

When a party challenges a trial court's findings of fact, the appellate court will affirm unless the court's findings

- 9 -

were against the manifest weight of the evidence.  See, e.g., In re Estate of Lower, 365 Ill. App. 3d 469, 477, 848 N.E.2d 645, 652 (2006).  However, the ultimate decision whether to award educational expenses should be reviewed for an abuse of discretion.  See, e.g., In re Marriage of Hubbs, 363 Ill. App. 3d 696, 699-700, 843 N.E.2d 478, 482-83 (2006) (finding that a trial court's determinations on dissipation and the valuation of marital property should be reviewed under the manifest-weight-of-the-evidence standard of review and that the review of the trial court's determination on the ultimate division of marital property should be conducted under an abuse-of-discretion standard of review; the court noted that "dissipation and the valuation of marital assets are generally factual determinations" while "the circuit court's decision on the ultimate division of marital property depends upon a circuit court's view of the facts *** [and] statutory factors, and so the circuit court is accorded more discretion").  Therefore, this court will review the trial court's factual findings under the manifest-weight-of-the-evidence standard, but we review the court's ultimate determination for an abuse of discretion.

B. Trial Court's Determination That the Cost To Attend Lincoln College Was Reasonable Was Against the Manifest Weight of the Evidence and the Court Abused Its Discretion by Ordering Keller To Pay One-Third of that Cost

Keller argues nothing in the record shows that Lincoln College was superior in any way or even equal to Shawnee.  We agree.

- 10 -

"A child does not have an absolute right to a college education." Spear, 244 Ill. App. 3d at 630, 613 N.E.2d at 360. However, a trial court may order the payment of postsecondary educational expenses, including college, professional, or other training. 750 ILCS 5/513(a)(2) (West 2006); see also Rawles v. Hartman, 172 Ill. App. 3d 931, 933, 527 N.E.2d 680, 681 (1988) (section 513 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (Ill. Rev. Stat. 1985, ch. 40, par. 513) is applicable to a proceeding brought under the Illinois Parentage Act of 1984 (Parentage Act) (Ill. Rev. Stat. 1985, ch. 40, par. 2501 et seq.), and a court may provide for the education and maintenance of a nonminor child born to unmarried parents). The payable expenses include, but are not limited to, room, board, dues, tuition, transportation, books, fees, registration and application costs, medical insurance, dental expenses, and living expenses during the school year and periods of recess. 750 ILCS 5/513(a)(2) (West 2006).

When deciding whether to require the payment of postsecondary education expenses and the amount thereof, the trial court should consider "all relevant factors that appear reasonable and necessary." 750 ILCS 5/513(b) (West 2006). The statutory factors include (1) the financial resources of both parents; (2) the standard of living the child would have enjoyed had the marriage not been dissolved; (3) the child's financial resources; and (4) the child's academic performance. 750 ILCS 5/513(b) (West 2006). Other relevant factors include the cost of

the school, the programs offered at the school, how the school meets the child's goals, the benefits the child will receive from attending the school, and whether the parent needs to pay for a private school education when adequate public schools are available. See Spear, 244 Ill. App. 3d at 630, 613 N.E.2d at 360-61 (citing cases); In re Marriage of Schmidt, 292 Ill. App. 3d 229, 237, 684 N.E.2d 1355, 1361 (1997).

The petitioner bears the burden of proving that the respondent should contribute toward the college expenses of their child and the burden of showing how much the respondent should contribute. See In re Marriage of Taylor, 89 Ill. App. 3d 278, 283, 411 N.E.2d 950, 954 (1980). After the petitioner presents her evidence, the respondent has the burden of going forward with evidence that would "equally balance" the petitioner's evidence. Taylor, 89 Ill. App. 3d at 283, 411 N.E.2d at 954; see also Schmidt, 292 Ill. App. 3d at 239-40, 684 N.E.2d at 1362-63 (finding the respondent did not need to present his own evidence to meet his burden of proof when the parties' child did not provide any meaningful reasons for her choice of an out-of-state school over the state schools; in such circumstances, the respondent need only show the costs of the state schools and his own financial situation).

In this case, the record does not support the conclusion that Keller should be ordered to pay one-third the cost to attend Lincoln College when (1) Sussen and David did not present sufficient reasons for David's choice of Lincoln College

- 12 -

over in-state schools and (2) Keller presented evidence that an adequate, less-expensive public school was available. In determining whether to order contribution to the educational expenses for a particular school, a court may consider whether the child has access to a less-expensive public institution. Schmidt, 292 Ill. App. 3d at 237, 684 N.E.2d at 1361; Pearson, 111 Ill. 2d at 551-52, 490 N.E.2d at 1277 (affirming the trial court's order requiring the father to pay $100 per month toward his son's education and reversing the appellate court order directing the father to pay over $5,000 per year for his son to attend an out-of-state technical school; the trial court did not err by emphasizing the huge difference between the cost of the technical school compared to the Illinois junior college that offered a similar program). Here, the trial court noted that the parties did not present evidence of another proprietary school that cost less than Lincoln College. That analysis was wrong as a matter of law. The proper determination in this instance was whether David had access to a less-expensive school, proprietary or nonproprietary. In this case, David had access to Shawnee, which was considerably less expensive, and the record does not support the conclusion that Shawnee was not a comparable program.

The record indicated that Shawnee, an Illinois public community college, also offered an automotive-technology program that was ASE certified and awarded an associate-of-applied-science degree. The trial court concluded that the Shawnee program "would not necessarily be directly equivalent even of the

Lincoln College" program. However, nothing in the record supports that conclusion. No evidence was offered to demonstrate the relative merits of Lincoln College versus Shawnee, such as placement rates upon graduation or reputation in the industry. See, e.g., Spear, 244 Ill. App. 3d at 631, 613 N.E.2d at 361 (noting that the affidavit from a school administrator would have been more helpful had it stated the employment rate for graduating students rather than that the school had "more requests from employers" than could be filled). Moreover, while David and Sussen testified that NASCAR and Mercedes-Benz recruited from Lincoln College, David was unsure whether he wanted to pursue a job with either of those companies.

In examining the exhibits tendered to the trial court, this court notes that both programs apparently award an associate-of-applied-science degree and certification upon completion of the program. David expressed a desire to avoid general-education classes, which were not required at Lincoln College. However, the actual courses required by the Lincoln College program are not contained in the record. The general-education classes to which David referred for the Shawnee program appear to include a one-semester college orientation class, six hours of technical communication, three hours of technical math, and three hours of practical psychology. Without any indication of the actual courses required by the Lincoln College program, the trial court had no basis on which to conclude that the programs were not substantially equivalent, other than the

difference between a 15-month program and a 21-month program.

Even though the Shawnee program is longer, and even assuming David stayed in an apartment near Shawnee (rather than live at home) and had living expenses similar to those in Indianapolis, the cost of attending Lincoln College far exceed the cost of attending Shawnee. Using the trial court's calculation of David's living expenses for 15 months at Lincoln College ($8,520), David's living expenses to attend Shawnee would be $11,928 for 21 months. Adding that amount to the tuition cost at Shawnee ($4,757) results in a total cost of $16,685 to attend Shawnee. In contrast, the cost to attend Lincoln College (excluding the cost of books because the record contains no evidence of the cost of books at Shawnee) totals $34,030.

Nothing in the record indicates the reason for the huge difference in cost. David testified that Lincoln College offered a "high[-]performance" program, but the record does not indicate whether the high-performance course is included in the program for which David enrolled. The Lincoln College materials suggest it is an "add-on program" which requires additional cost and time. Specifically, the Lincoln College materials noted: "[Lincoln College] boasts *** a [six]-[c]ourse [h]igh[-] [p]erformance add-on program." Moreover, nothing in the record indicates what a high-performance course is or whether Shawnee offered such a course as well. Therefore, the trial court's conclusion that Shawnee was not a comparable school was against the manifest weight of the evidence, and the court abused its

discretion by ordering Keller to pay one-third of the cost of attending Lincoln College.  See, e.g. Spear, 244 Ill. App. 3d at 631, 613 N.E.2d at 361 (finding the trial court did not abuse its discretion by denying the request for contribution to pay college expenses at a nonaccredited Bible college); Schmidt, 292 Ill. App. 3d at 240, 684 N.E.2d at 1363 (finding the trial court did not err by ordering the father to pay one-half of the cost of attending a state school instead of one-half of the cost of attending the out-of-state school of his daughter's choice in light of the father's financial circumstances and the fact that no evidence was presented indicating why it was necessary or appropriate for the daughter to attend the out-of-state school).

This does not mean a child and custodial parent may never choose a private or expensive school when other less-expensive choices are available.  However, when a child wants to attend an expensive school, the petitioner must present evidence that (1) special programs or attributes of the school make the additional costs reasonable under the circumstances or (2) the more expensive school was necessary or more appropriate for the child.  See, e.g., Schmidt, 292 Ill. App. 3d at 239-40, 684 N.E.2d at 1362-63.  The next issue the trial court must address is whether the parents can afford such school.  See, e.g., Schmidt, 292 Ill. App. 3d at 240, 684 N.E.2d at 1363 (wherein the "trial court then was able to draw the conclusion there was no advantage shown to make [the father] pay more than the state[-] school costs, particularly in view of his financial situation").

Moreover, this conclusion does not interfere with the custodial parent's authority to direct a child's education. Here, David may attend whichever school Sussen and he choose. Nonetheless, the courts must decide whether the noncustodial parent must contribute to that education and in what amount. See, e.g., Spear, 244 Ill. App. 3d at 629, 613 N.E.2d at 360 (rejecting the petitioning mother's argument that the trial court interfered with her authority as the custodial parent to direct her child's education).

Keller also argues the trial court abused its discretion by concluding that Keller had the ability to pay the educational expenses. "The court should not order a party to pay more for educational expenses than he or she can afford." Pearson, 111 Ill. 2d at 552, 490 N.E.2d at 1277. The ability to pay is determined based on the party's resources at the time of the hearing. Pearson, 111 Ill. 2d at 552, 490 N.E.2d at 1277. A court may award sums of money out of the property and income of either parent. 750 ILCS 5/513(a) (West 2006).

The record discloses the bank account established for David contained approximately $5,000. In addition, Keller owned a motorcycle valued at $10,000. Further, at oral argument, Keller's counsel informed this court that Keller borrowed the money to pay the educational expenses ordered by the trial court. Here, the trial court did not abuse its discretion by concluding that Keller had the ability to pay for David's educational expenses.

To conclude, the trial court abused its discretion by directing Keller to pay the cost for David to attend Lincoln College when an adequate public school was available. On remand, the trial court shall direct Keller to pay one-third of the total cost to attend Shawnee for the completion of an associate-of-applied-science degree in automotive technology. Morever, the court shall order Keller to pay one-third of the reasonable living and transportation expenses David would have incurred by attending that school (i.e., the cost to live at home with Sussen and commute or to obtain an apartment near Shawnee). If the record is inadequate to make that determination, the court shall hold a hearing for that purpose. In addition, because the court did not make any provision in its original order for medical and dental expenses, the court may do so on remand.

### III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand with directions.

Reversed and remanded with directions.

TURNER, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent. The majority concludes that the trial court did not abuse its discretion by concluding that Keller had the ability to pay for David's educational expenses but did abuse its discretion by directing Keller to pay for the school of David's choice when an adequate public school was available. Reevaluating the evidence, the majority concludes that Sussen did not present evidence that the extra $17,345 it would cost for David to go to Lincoln was reasonable, necessary, or appropriate. I disagree.

Sussen presented evidence that the Lincoln program lasted only 15 months and focused solely on David's area of interest, high-performance automotive technology, and that two well-known companies recruited from Lincoln. On the other hand, Shawnee would take at least 24 months to complete and would involve taking general-education courses, and no evidence suggested that Shawnee offered a high-performance program or that top automotive companies recruited Shawnee graduates.

Custodial parents are not free to choose a more expensive school without reason. As the majority noted, choosing a more expensive school is only appropriate if the custodial parent shows that "(1) special programs or attributes of the school make the additional costs reasonable under the circumstances or (2) the more expensive school was necessary or more appropriate for the child." Slip op. at 16, citing Schmidt, 292 Ill. App. 3d at 239-40, 684 N.E.2d at 1362-63. Such restrictions are necessary

- 19 -

to prevent cases where a custodial parent may abuse his or her position of decision-making authority by allowing a child to choose a more expensive school without good reason and then stick the noncustodial parent with a larger bill.

This does not appear to be a case where the child is ambivalent about where he wants to go to college, so the custodial parent picks the more expensive school to stick the noncustodial parent with a larger bill. First, Sussen and David together are paying two-thirds of the more expensive school. Sussen, a single mother who also cares for a 12-year-old daughter for whom she receives no child support and who clearly does not make more than $26,000 a year, is not financially able to pick an expensive school just to spite Keller. David found a school that fit his career choice and presented the court with a reasonable explanation as to why the more expensive school was more appropriate for him.

Second, Sussen and David are not asking that Keller pay a great amount more. According to the majority's figure, they are asking for Keller to pitch in $5,781 more (one-third of the extra $17,345 it would cost for David to go to Lincoln), so that David may go to the school more tailored to his aspirations.

Finally, the evidence shows that David wants to be an automotive mechanic who works with high-performance automotive technology. If he were forced to go to Shawnee, he would have to take nonautomotive courses and attend for nine more months, and he could not focus on high-performance technology. The trial

court concluded that the evidence showed that Lincoln offers special programs or has attributes that made the additional costs reasonable or at least that the school was more appropriate for David's chosen career path, justifying the added costs. This decision was not an abuse of discretion.

While Sussen and David could have aided their case had they presented more evidence regarding the special traits of Lincoln's program and how it was more appropriate given David's ambitions, their failure to do so should not be fatal. Sussen and David presented enough evidence to find that it was necessary or appropriate for David to attend Lincoln. When some evidence is present to support a trial court's decision, this court should not reweigh that evidence in order to reverse.