2024 IL App (1st) 230957-U

SECOND DIVISION
August 16, 2024

No. 1-23-0957, consolidated with 1-23-1288

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| In re the Marriage of: ) | |
| ) | Appeal from |
| BERNARDO GARCIA, ) | the Circuit Court |
| ) | of Cook County |
| Petitioner-Appellant, ) | |
| ) | 09D9348 |
| v. ) | |
| ) | Honorable |
| MARIA M. GARCIA, n/k/a MARIA MORALES, ) | Mary S. Trew, |
| ) | Judge Presiding |
| Respondent-Appellee. ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

## O R D E R

¶ 1    *Held*: Former spouse failed to show that the court's decision to order both parents to contribute equally to their daughter's college expenses was against the manifest weight of the evidence.

¶ 2    Bernardo Garcia appeals from an order granting his ex-wife's petition pursuant to terms in their divorce judgment to contribute half of their older daughter's unmet college expenses. Garcia contends that his ex-wife, Maria M. Garcia n/k/a Maria Morales, should have conferred with him before choosing a private university instead of a less expensive school; he lacks the means to split the expenses with her; and the record was inadequate for the court's decision. Garcia erroneously

filed a second appeal from the same circuit court order, but then filed a motion to consolidate the two appeals, which we granted. No additional issues are presented via the second appeal.

¶ 3    After two children and seven years of marriage, Garcia and Morales divorced in 2009. He was 32, she was 29, and their daughters were five and two. The dissolution judgment incorporated Garcia and Morales's marital settlement agreement, providing in relevant part as follows:

"[I]n consideration of the mutual promises and other good and valuable contribution, hereby acknowledged, the parties hereby freely and voluntarily agree as follows:

* * *

5.6 COLLEGE EDUCATION EXPENSES:

A) The parties *shall contribute* [emphasis added] towards the education of the child for college for the costs of tuition, supplies, books, registration and other required fees, board and room and other charges. The contribution of each parent shall be based upon each parent's financial ability at the time the expenses are incurred, as well as the child's financial resources as equity requires[;]

B) The decisions affecting the education of the children, including *the choice of college shall be made by the parties jointly* [emphasis added], and the parties shall consider the expressed preference of the cost of education, the parent's financial means and other reasonable criteria.  Neither party shall unreasonably withhold his or her consent to the expressed preference of the child;

C) In the event a child shall be eligible for scholarships, grants, G.I. Bill of Rights (Veteran's Benefits) or the like, the same shall be used by the child before the HUSBAND or WIFE is called upon to pay or contribute to or make up the difference

- 2 -

for said education;

D) The obligation to pay for college will be limited to an undergraduate school, which must be completed within five years after the child graduates from high school;

E) The child must carry a sufficient number of courses or units to be considered by the school attended to be a full time student, and must maintain a passing average as prescribed by the school, and;

F) Nothing in this Article is intended to prohibit or discourage either party from voluntarily paying for more schooling."

¶ 4    Twelve years later, on March 11, 2022, Morales filed a "Petition for Contribution to College and Living Expenses for the Parties' Dependent Child and Other Relief." She alleged that their oldest daughter would be graduating from high school in June of that year and intended to begin college in the fall at DePaul University's School of Nursing. One of the attached exhibits was a financial aid document indicating that the school was committing $104,400 to the daughter's four-year degree. DePaul specified that her first year in the nursing school program would cost $59,133. She did not qualify for any need-based grants or scholarships (Pell, Illinois MAP, or SEOG), but was offered $26,100 in DePaul scholarships and grants and could personally take $5500 in student loans. This would leave only $27,533 uncovered, which was less than half of her freshman year expenses. The school anticipated a $28,400 federal Parent PLUS Loan. Morales asked the court to allocate the unmet college expenses between the two parents.

¶ 5    Garcia responded that when the private university was chosen, he "was not consulted or made part of the decision-making process," he did not know whether his ex-wife and daughter considered less expensive alternatives, and the daughter had "an obligation" to seek enrollment at

public schools, including community colleges. He also argued that parental contributions were not compulsory and were in the court's discretion pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/513(a) (West 2020)), and that he should not have to contribute more than he could afford. He asked the court to deny Morales' motion outright or at least take into account that he had been ordered to contribute to their other daughter's support and other expenses.

¶ 6     An evidentiary hearing was conducted on October 17, 2022. The record compiled for our review does not include a verbatim transcript or one of its alternatives, but the following undisputed facts are gleaned from Garcia's motion to reconsider and Morales' response in opposition. Morales testified that neither she nor her daughter talked with Garcia about where the daughter should attend college. Morales had taken a $24,000 Parent PLUS Loan for their daughter's freshman year and the debt would have to be repaid at the rate of $309 per month beginning in June 2023. Morales also testified about ongoing educational and medical expenses for their younger daughter. Morales was remarried, she was earning $84,000 per year and her current husband was earning $94,000 per year. Garcia then testified, stating that he also had remarried, that his net monthly income was $7,155 per month and his current wife's gross income was $140,000 per year. His obligations exceeded his net income. His monthly expenses included lease payments on a 2022 BMW vehicle, and it had taken him 15 years to "achieve the financial stability" necessary to begin leasing this particular car in March of 2022 (the same month that Morales petitioned for contribution). His "transportation expenses" totaled $1956 per month. His personal expenditures totaled $1079. His college loan repayments were $200 and he still owed $14,090 for his studies. He was paying $2637 in household expenses and his current wife was

paying the same amount. Garcia said that after these expenditures, he had $1033, from which he was supposed to contribute $1080 for the younger daughter's support and additional amounts towards her private school and medical expenses.

¶ 7     The circuit court's subsequent written order indicates that Garcia's testimony about his financial resources was not credible. The court determined that neither parent would have difficulty contributing $12,000 each for the 2022-23 school year and then ordered each of them to contribute that amount to their daughter's unmet expenses totaling $24,000. Garcia filed a motion for reconsideration that was denied and then he filed this appeal.

¶ 8     Garcia first argues that a child does not have an absolute right to a college education and that the circuit court has discretion to impose those expenses on parents. Also, as the petitioning party, Morales bore the burden of proving that Garcia should and could contribute to the daughter's post-secondary education costs. He further contends that both Article 5.6(B) of the dissolution judgment, regarding "COLLEGE EDUCATION EXPENSES," and section 513(a) of the Act, regarding "Educational expenses for a non-minor child" (750 ILCS 5/513(a) (West 2020)), indicate that "equity" is the basis for determining whether the parents have any obligation. (The equity standard actually appears in Article 5.6(A) of the marital settlement agreement, rather than Article 5.6(B).) Garcia concludes, "Equity requires that [he] not be obligated to pay these costs, or to be obligated to pay much less than has been ordered."

¶ 9     Garcia supports all of these statements with precedent that is not on point. He relies primarily on *People ex rel. Sussen v. Keller*, 382 Ill. App. 3d 872 (2008), which, as the title suggests, originated when the Illinois Department of Public Aid filed a paternity suit against Keller on Sussen's behalf. The case is readily distinguishable because Keller and Sussen did not marry

and never entered into a marital settlement agreement. When their son was in his teens, Keller inherited some money, Sussen asked that part of it be designated for their son's support and college expenses, and the circuit court ordered Keller to set aside the funds. *Id*. at 873. Several years later, Sussen petitioned for Keller's contribution to the boy's college education expenses. *Id*. The circuit court then had to make two determinations: (1) whether to require payment of the postsecondary education expenses, and (2) the appropriate amount. *Id*. at 878. These determinations were governed by section 513 of the Act, a statute that includes factors that frame the petitioner and respondent's presentations and the circuit court's consideration. *Id.* at 878-79 (citing 750 ILCS 5/513(b) (West 2006)). In this context, "[a] child does not have an absolute right to a college education." *Sussen*, 382 Ill. App. 3d at 878. In the other case Garcia erroneously relies on, *Petersen v. Petersen*, 403 Ill. App. 3d 839, 841 (2010), *aff'd in part and rev'd in part by In re Marriage of Petersen*, 2011 IL 110984, the parties' divorce decree stated the following about their children's post-secondary education: " 'The Court expressly reserves the issue of each party's obligation to contribute to the college or other education expenses of the parties' children pursuant to Section 513 of the [Act]." None of the children were in college yet and the oldest of them would not start for another three years. *Id*. By its plain terms, the *Petersen* dissolution judgment "reserve[d] the issue" (*id*.) of whether the parents had any obligation to pay for college or other education expenses and it incorporated the section 513 factors.

¶ 10     In contrast, Garcia and Morales entered into a marital settlement agreement in which they "freely and voluntarily agree[d]" that they "shall contribute towards the education of the child for college," they included criteria for determining their contributions rather than defaulting to section 513's factors, and then their agreement was incorporated into the dissolution judgment. "This was

an agreement between the parties and not a judicial determination of the parties' rights, so we are dealing with a contract between the parties." *In re Marriage of Schmidt*, 292 Ill. App. 3d 229, 234 (1997); *In re Marriage of Haller*, 2012 IL App (5th) 110478, ¶ 26 (marital settlement agreements are contracts and are governed by contract law principles); *In re Marriage of Kincaid*, 2012 IL App (3d) 110511, ¶ 32 (same); *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009) (same).

¶ 11 The interpretation of a marital settlement agreement is a question of law and is reviewed *de novo. Blum*, 235 Ill. 2d at 33. However, the factual findings that inform this interpretation are given deference on review and are to be reversed only when they are against the manifest weight of the evidence. *In re Marriage of Gibson-Terry and Terry*, 325 Ill. App. 3d 317, 322 (2001). A court's findings are against the manifest weight of the evidence only when the opposite conclusion is apparent or when the findings are unreasonable, arbitrary, or not based on evidence. *In re Marriage of Levinson,* 2012 IL App (1st) 112567, ¶ 32.

¶ 12 The question of whether Garcia is legally obligated to contribute to his children's post-secondary education and living expenses was determined in 2009, when he contracted with Morales and the circuit court entered a judgment of dissolution of marriage which included the contract. See *Gaddis v. Gaddis*, 20 Ill. App. 3d 267 (1974). Their contract was apparently drafted by Garcia's attorney, as the judgment order includes the name and contact information for his attorney and specifies that Morales represented herself. "Illinois courts look with favor upon agreements that determine the essential issues of property division, maintenance, and the custody, support, and education of the children." *In re Marriage of Holderrieth*, 181 Ill. App. 3d 199, 206 (1989); *Gaddis*, 20 Ill. App. 3d at 270. "It is generally held that if and when such property settlement agreements are embodied in the divorce decree itself, its terms will not thereafter be

modified under any circumstances, and a trial court is without authority to modify it or enter a decree contrary to it." *Id.*; *Holderrieth*, 181 Ill. App. 3d at 206. A court "should not release one of the parties from terms actually agreed upon but later found disadvantageous when that party has already enjoyed the benefits of the agreement." *Gaddis*, 20 Ill. App. 3d at 273. Like with any other contract, a court will determine the parties' intent from the language of their agreement and the terms that they chose will be read with their plain, ordinary meaning. *Blum*, 235 Ill. 2d at 33. "The parties' intent must be determined from the instrument as a whole and not from any one clause standing alone." *Holderrieth*, 181 Ill. App. 3d at 202. In their 2009 agreement, Garcia and Morales stated that they "freely and voluntarily agree[d]" that they "shall contribute towards the education of the child for college." "Shall" is commonly understood to be a mandate, a requirement. *In re Marriage of Self*, 265 Ill. App. 3d 804, 805 (1994) (" 'shall' ordinarily connotes a mandatory obligation"). After negotiating their agreement, they tendered it to the circuit court and informed the judge that "[s]aid Agreement was entered into freely and voluntarily between the parties hereto and it is not unconscionable and ought to receive the approval of the Court." When he was getting divorced, Garcia actively sought the circuit court's acceptance of the marital settlement agreement which included the prominent statement: "Each party considers it to be in their best interest to settle all issues that could be raised by either of them in the litigation, and forever, finally, and fully to settle and adjust all right that either party may have against the other."

¶ 13    Therefore, when Morales petitioned in early 2022 for Garcia's contribution to their older child's unmet college and living expenses at DePaul, Morales was seeking enforcement of the education expenses language in the 2009 judgment, rather than asking the circuit court to determine the issue of contribution for the first time. Garcia and Morales are required pursuant to

the 2009 judgment to contribute to their children's college education expenses. In addition, the parameters the parties set out in their marital settlement agreement, rather than any factors or standards that might be relevant under section 513 (750 ILCS 5/513 (West 2000)), control the outcome of the current contribution petition. *Holderrieth*, 181 Ill. App. 3d at 206 ("Sally conceded during closing argument that the settlement agreement, rather than section 513, controlled the disposition of the case. We agree."); *In re Marriage of Houston*, 150 Ill. App. 3d 608, 613-14 (1986) (same).

¶ 14    The order on appeal indicates that the circuit court gave deference to the terms of the parties' marital settlement agreement. This was "in keeping with Illinois' strong public policy to encourage parties to resolve as many issues as possible by agreement before resorting to litigation." *In re Marriage of Coulter and Trinidad*, 2012 IL 113474, ¶ 29; *Holderrieth*, 181 Ill. App. 3d at 206. The Illinois supreme court has remarked about the strength of this public policy when parents divorce:

>       "The Act itself demonstrates that this policy is at least as strong, if not stronger, in the context of disputes between divorcing parents as it is in other contexts. The Act specifically states that among its purposes are to: 'promote the amicable settlement of disputes that have arisen between parties to a marriage'; 'mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage'; and 'secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation.' 750 ILCS 5/102(3), (4), (7) (West 2010)." *Coulter*, 2012 IL 113474, ¶ 30.

¶ 15    While the Act is not directly relevant to this particular dispute, the statute embodies this

jurisdiction's public policy to support marital settlement agreements. See *Gaddis*, 20 Ill. App. 3d at 273 (agreed-upon terms should be enforced).

¶ 16    Article 5.6(A) of the 2009 judgment provides that Garcia and Morales' contributory college education expenses will include "tuition, supplies, books, registration other required fees, board and room and other charges." Morales sought only some of those costs from Garcia, however, for their daughter's first year of nursing school. The DePaul financial aid document specified that "Tuition & Mandatory Fees" for the 2022-23 school year would include $43,065 for tuition, $651 in mandatory student fees, and $225 in mandatory orientation fees. In addition, the daughter's room and board or "on-campus housing cost and meal plan" for the year would be $16,068. These expenses totaled $59,133. Morales did not also petition for the costs of the daughter's "supplies, books *** and other charges" during freshman year, as she could have pursuant to Article 5.6(A). Article 5.6(A) also states, "The contribution of each parent shall be based upon each parent's financial ability at the time the expenses are incurred, as well as a child's financial resources as equity requires," which are terms that we will address below.

¶ 17    Garcia argues the importance of Article 5.6(B)'s statement that "decisions affecting the education of the children, including choice of college shall be made jointly." He contends that Morales should have conferred with him so that the parents could jointly decide whether their daughter would attend DePaul, "as opposed to initially going to a less expensive state school or community college" and that unless there was a joint agreement, his support obligation was never triggered. Garcia contends that it was unfair of Morales or the court to expect him to contribute to the daughter's support in light of this clause. He cites *Holderreith*, 181 Ill. App. 3d at 202, for the proposition that settlement provisions within a dissolution judgment should be construed to give

1-23-0957, cons.

effect to the intention of the parties, and *Long v. Kemper Life Insurance Co.*, 196 Ill. App. 3d 216, 218 (1990) for the "basic maxim of equity that he who seeks equity must do equity."

¶ 18     Garcia is attempting to elevate the joint-decision clause above all of the other language in the parties' marital settlement agreement. Courts, however, ascertain the contracting parties' intent from the language that they chose at the time, and from the contract as a whole, rather than on the basis of a single clause in isolation. *Holderrieth*, 181 Ill. App. 3d at 202. Furthermore, Garcia's reliance on *Holderrieth*, 181 Ill. App. 3d 199, and *Long*, 196 Ill. App. 3d 216, is misplaced because neither court contemplated a joint-decision clause or in any other way indicated that Garcia should be excused from his agreed-upon obligations to financially support his children. In addition, the order on appeal indicates that the circuit court did consider the joint-decision clause–in the context of the full dissolution order; the parties' testimony, financial exhibits, and arguments; and the Act– before allocating the unmet college expenses equally between the two parents. The order at issue specifies, "9. The Court finds that Ms. Morales did not confer with Mr. Garcia on the cost and selection of DePaul University as the post-secondary educational institution for *** the parties' non minor child. The Court finds that Ms. Morales should have conferred with Mr. Garcia before making any selection."

¶ 19     In addition, the record discloses that Morales did include Garcia in their daughter's college selection process, albeit through the courts, by seeking his contribution before the daughter was enrolled at DePaul. This case is unlike *Van Nortwick v. Van Nortwick*, 87 Ill. App. 3d 55, 58 (1967), in which one parent chose the younger child's preparatory school, enrolled the child, paid the tuition, and "then present[ed] both the Court and the other parent with a *fait accompli* and a request to impose the financial burden on the one who was not consulted." There, the appellate

court found that it was improper to seek reimbursement after an accomplished fact. *Id.* In contrast, the divorce judgment that was at issue in *In re Marriage of Moriarty*, 132 Ill. App. 3d 895, 898-99 (1985), also incorporated a marital settlement agreement with a joint decision clause and the custodial parent subsequently petitioned the court *before* enrolling two of the three children in a parochial high school. The circuit court granted the petition for contribution, which the appellate court affirmed, in part because the custodial parent conformed with *Van Nortwick* by not waiting to petition until after the education expenses had been incurred. *Id.* The petitioner in *Moriarity* "did not present [the former spouse] and the trial court with a *fait accompli.*" *Moriarty*, 132 Ill. App. 3d at 898. Like the petitioner in *Moriarity*, Morales conformed with *Van Nortwick* in March 2022, when she sent Garcia her filed petition regarding the upcoming 2022-23 school year. This was in the spring, on March 11, 2022, before their older daughter had graduated from high school. Morales states in her appellate brief that she e-mailed Garcia the same information the day before, March 10, 2022. The first quarter of DePaul's nursing school program would not start for approximately five months. Morales' petition would not be heard, however, for seven months. Instead of facilitating the earliest possible resolution of Morales' petition regarding the older child's *future* college expenses, Garcia was busy petitioning to reduce his child support obligation upon the daughter's eighteenth birthday and opposing Morales' second and third petitions for rule to show cause due to Garcia's failure to comply with a 2012 agreed order about responsibility for the children's medical and educational expenses.[1] He also began leasing a luxury car in March 2022. In her third petition for rule to show cause, Morales indicated that she complied with the

---

[1] Morales' second petition for rule to show cause was filed March 23, 2022 and her third petition for rule to show cause was filed July 25, 2022.

2012 agreed order when she e-mailed payment receipts to Garcia for the older child's $200 college registration fee on March 15, 2022; $400 housing fee on April 3, 2022; $400 school deposit on May 17, 2022; and $650 school deposit on May 23, 2022. Garcia is not disputing that Morales was conveying this information to him on a timely basis. Morales informed Garcia of their daughter's extraordinary opportunity to study at a prestigious college, but with a very generous financial aid package, and then Morales kept Garcia abreast of their daughter's interest in the nursing school program. Morales did not unilaterally choose and enroll the 18 year old in a school and then present this development to the court and her ex-spouse as an accomplished fact. She specified in her third petition for rule to show cause that he "has ignored the emails [indicating incremental steps are being taken towards a commitment to DePaul] and has not made any payments for reimbursement [of the minor related fees] *** despite the terms of the [2012] Agreed Order." Apparently, it was not until April 11, 2022 that Garcia expressed opposition to DePaul by filing a written response to Morales' petition. Garcia did less than the bare minimum by speculating that a different school might be more appropriate than DePaul. In his written response and later presentation at the evidentiary hearing, Garcia failed to identify any schools that would be more advantageous for the parents and child. Garcia failed to compare and contrast any nursing programs, overall costs, availability of financial aid, and address the myriad other considerations that go into choosing an undergraduate education. Furthermore, Garcia's appeal does not account for the other statement in Article 5.6(B) that "[n]either party shall unreasonably withhold his or her consent to the expressed preference of the child." The daughter's expressed preference for participating in the nursing school program at a well-known and highly-regarded Chicago college, that was not only supported by a substantial scholarship and grant package, but was also located near her family, is

entirely reasonable, and was an interest that was never effectively challenged by her father.

¶ 20    None of the remaining terms of Article 5.6 of the divorce judgment are in controversy. Article 5.6(C) obligated the daughter to accept "scholarships, grants, G.I. Bill of Rights (Veteran's Benefits) or the like *** before the [parents are] called upon to pay or contribute to or make up the difference." DePaul's financial aid document characterized $26,100 in scholarships and grants for the 2022-23 school year as "free money." The daughter did accept that "free money." Also, looking back at Article 5.6(A), the court was required to consider the "child's financial resources as equity requires," and the record indicates that the court took into consideration that the daughter accepted the "free money" and that she herself took $5500 in student loans. Also not at issue is Article 5.6(D), which limits the parents' obligation to the first five years of undergraduate school. The next sentence, Article 5.6(E) requires the child to carry a full schedule of classes and maintain a passing average. Similarly, DePaul's financial aid document indicates assistance is contingent upon the student being "consecutively enrolled, full-time for each quarter and *** in good academic standing to receive the full dollar commitment." And finally, but of no less importance, Article 5.6(F) reminded these parents, "Nothing in this Article is intended to prohibit or discourage either [parent] from voluntarily paying for more schooling."

¶ 21    Morales' petition for contribution and the circuit court's ruling were consistent with the terms of the education expenses language in the 2009 divorce judgment and supported by the record on appeal.

¶ 22    Garcia's last argument is similarly unpersuasive. He contends that the circuit court's decision was an abuse of discretion because the court's decision was based on an inadequate record. Citing *Street v. Street*, 325 Ill. App. 3d 108, 114 (2001), Garcia contends that Morales bore

the burden of proving that he could contribute anything to a college education, and also that his current wife's expenses were minimal enough that her income could help him meet his obligation to his children's college expenses. He points out that his current wife was in the courtroom and could have testified, but Morales did not call her. The authority Garcia is relying upon, however, concerned an ex-husband who was prevented from investigating or discovering the assets and income that were available to his ex-wife's new spouse. *Id.* at 113. According to the appellate court, "the traditional rule had been that the financial assets of the current spouse are not relevant in making a support determination," but the current trend is to authorize review of the current spouse's assets and income. *Id.* at 114. Therefore, the court remanded the case for further discovery into the financial resources that were available to the ex-wife and adjudication of her ability to contribute to the college expenses that she was expected to meet. *Id.* at 115. Thus, *Street* might be cited for the proposition that the financial resources of a current spouse could be open to discovery (*Street*, 325 Ill. App. 3d at 114), but the opinion does not require that investigation. Nothing in *Street*'s analysis suggests that Morales had to question Garcia's new wife or that the circuit court proceeded to judgment with an inadequate record.

¶ 23    Garcia's argument is an attempt to sidestep the circuit court's conclusion that when Garcia testified about his own resources and liabilities, he was not believable. The court acknowledged Garcia's testimony that he was incapable of contributing, but nevertheless ruled as follows:

   "8. The Court finds that the parties have at one time chosen to have children, and as such it is not fair for one parent to pay for post-secondary expenses.

   9. The Court finds that Ms. Morales did not confer with Mr. Garcia on the cost and selection of DePaul University as the post-secondary educational institution for *** the

parties' non minor child. The Court finds that Ms. Morales should have conferred with Mr. Garcia before making any selection.

10. Ms. Morales testified that she incurred a loan in the amount of $24,000.00 to pay for the out of pocket costs for the 2022-2023 post-secondary expenses for the parties' non-minor child.

11. The Court finds that the out of pocket expenses for the parties is not prohibitive or outrageous.

12. *The Court believes that neither party will have trouble in contributing* to the post-secondary educational expenses for the minor child in the amount of $12,000.00 each for the 2022-2023 school year." (Emphasis added.)

¶ 24    Garcia filed a motion for reconsideration, which the circuit court denied. At the conclusion of oral arguments, the court said, "I wasn't particularly impressed with Mr. Garcia's credibility and, you know, the notion that he can't afford it." Also, "I found facts that were contrary to what Mr. Garcia was positing in support of his argument."

¶ 25    The court clearly found that Garcia had sufficient resources and then reiterated that finding when Garcia sought reconsideration.

¶ 26    Garcia does not point to any evidence that the circuit court's findings were unreasonable, arbitrary, or not based on the evidence, or that the opposite conclusion was apparent. See *Levinson,* 2012 IL App (1st) 112567, ¶ 32. From our perspective, the manifest weight of the record supports the court's findings. The circuit court heard from and considered the parties' testimony and all the evidence they chose to present. The record indicates that the circuit court had adequate financial information on which to base its decision. The court believed Morales and did not believe Garcia.

1-23-0957, cons.

" 'A reviewing court, which has only a cold record before it, will not presume to substitute its own independent evaluation of witness credibility unless the trial court's evaluation is found to be manifestly erroneous.' " *In re Marriage of White & Cipriani*, 2017 IL App (2d) 160999-U, ¶ 51 (quoting *In re Marriage of Lewis*, 188 Ill. App. 3d 142, 146 (1989)). " 'So much is revealed by the tone of voice, facial expressions and general demeanor of a witness.' " *White*, 2017 IL App (2d) 16099-U, ¶ 51 (quoting *People v. Williams*, 22 Ill. 2d 498, 502 (1961)). Garcia has failed to demonstrate that the circuit court erred by finding that his financial testimony was not credible and that he would not "have trouble" contributing $12,000 to the first year of his older daughter's college education.

¶ 27   Based on this record and Garcia's unpersuasive arguments, we affirm the circuit court.

¶ 28   Affirmed.